USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 12/21/07

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
UNITED STATES OF AMERICA,

- against -

JOSE S. PORRAS-QUINTERO,

Defendant.
-----------------------------------------------------------X

07 CR 228 (RPP)

**OPINION & ORDER**

**ROBERT P. PATTERSON, JR., U.S.D.J.**

On May 9, 2007, Jose Porras-Quintero ("Defendant") filed a motion to suppress the following: 1) any physical evidence seized by DEA agents from 86-06 35th Avenue, Apartment 3N, Queens, New York, on March 24, 2007; 2) statements made by Defendant on March 24, 2007; and 3) electronic surveillance communications and any evidence derived therefrom. On June 12, 2007, the Court granted Defendant's request to hold in abeyance that part of his motion seeking to suppress physical evidence seized on March 24, 2007 from the apartment, and any statements made during that search.[1] By letter dated August 27, 2007, Defendant renewed that portion of his motion that was held in abeyance, and requested an evidentiary hearing. On October 5, 2007, the Court held an evidentiary hearing.[2]

---

[1] On July 30, 2007, the Court held oral argument at which it denied Defendant's motion to suppress the electronic surveillance communications on the grounds that the Government's last application had not shown the need for further electronic surveillance. The Court found that need for further surveillance existed because documents filed in support of the application showed that the Government sought the telephone call intercepts to determine how Joel Fermin was obtaining heroin, and that prior call intercepts had only provided evidence of to whom Fermin was distributing heroin. (Hr'g. Tr. 13, July 30, 2007.)

[2] At the beginning of the hearing, the Government stated that it understood the scope of the hearing to be limited to consent to enter and search the apartment where the Defendant was staying. (Hr'g. Tr. 3, Oct. 5, 2007.) However, at the hearing, the defense expanded the scope to include the issue of consent to search the suitcase. (Id. at 3-5.) The Government consented to first conduct examination on consent to enter the apartment, and after a recess allowing the Government to speak to its witnesses, then conduct examination on consent to search the suitcase. (Id. at 12.)

## THE TESTIMONY

*The Jaramillo Affidavit*

In support of his letter dated August 27, 2007, Defendant submitted a sworn affidavit dated August 24, 2007 and signed by Juan Carlos Jaramillo ("Jaramillo"), who resided at the apartment in question. In his affidavit, Jaramillo stated the following:

1. On March 24, 2007, I resided at 86-06 35th Avenue, Apt. 3N, Queens, New York.

2. I met Jose Quintero two days before the incident in the building. Mr. Quintero knocked on my door and stated that a neighbor informed him that I was looking for someone to rent a room in his apartment. I told Mr. Quintero that this was true and Mr. Quintero said that he wanted to rent the room. Mr. Quintero paid me three hundred dollars for the room.

3. On March 24, 2007, Mr. Quintero knocked on the front door because he did not have a key and I let him in. I recall a white male with blond hair in the hallway by the stairs, when I opened the door for Mr. Quintero. Less than two minutes later, I went downstairs and was stopped on the first floor by the same white male and a Hispanic male. The Hispanic officer did all the talking in Spanish because I do not speak English. They identified themselves as officers and asked me if I lived in Apartment 3N. I responded "Sí," and was then asked if I knew the person who I just let into my apartment. I informed the officers that the person I just let in rents a room in my apartment.

4. The Hispanic officer said "Vamos," and I was taken upstairs to my apartment. As I was about to put the key into his apartment door to open, I decided to ask

the officers if they had a warrant to go inside the apartment. The Hispanic officer told me that they did not have a warrant but if I did not cooperate, they would remain by my apartment until the warrant arrived and would then enter and ransack the apartment. I did not want this to occur, so I opened the door and all three of us entered.

5. Mr. Quintero was coming out of his room when the officers entered the apartment, and was instructed to sit on the couch. I was told to sit on the couch as well. All of the rooms in the apartment were searched. The Hispanic officer searched Mr. Quintero's room, while his partner remained by the door keeping an eye on me and Mr. Quintero.

6. At one point, the Hispanic officer came out and asked if anyone had a key for a suitcase because there was a lock on it. Mr. Quintero gave the officer a key and he went back inside the room. The Hispanic officer spent about fifteen minutes in the room and then came outside and told his partner that he did not find anything and that he should give it a try. The white officer entered the room and the Hispanic officer remained by the door.

7. Although the Hispanic officer spoke Spanish, he was telling me to tell Mr. Quintero to tell them where the stuff was. Mr. Quintero did not say a word during the entire incident. About five minutes after entering the room, the white officer came out and said that he found what they were looking for. The white officer had a small black bag in his hand, but I did not get to see its contents. Mr. Quintero was then placed in handcuffs. The Hispanic Officer asked me for my personal information and I provided it.

*A. Consent to Enter the Apartment*

*i. Agent Triana's Testimony*

At the October 5, 2007 hearing, the Government called Eric Triana, a Special Agent of the Drug Enforcement Administration (DEA). Agent Triana has been employed by the DEA for seven years and has three years of experience as a police officer in Baltimore.[3] (Hr'g. Tr. 14, Oct. 5, 2007.) On direct examination, Agent Triana testified that he was one of the agents assigned to a Title III Wiretap; and that Defendant had been intercepted on it. (Id. at 14.) On March 24, 2007, Agent Triana received a telephone call regarding a wiretap intercept. (Id. at 15.) He then went to a pool hall at 86-10 Roosevelt Avenue in Queens, NY where he spotted Defendant. (Id.) Agent Triana, and Brian Shanahan, also a DEA special agent, next followed Defendant to an apartment building at 86-06 35th Avenue in Queens. (Id. at 15-16.) Agent Shanahan called Agent Triana on his cell phone and they met downstairs in the lobby.[4] (Id. at 17, 159.)

Agent Triana testified that while he was talking with Agent Shanahan inside the building, Jaramillo appeared; and that Agent Shanahan "engaged [Jaramillo] in a conversation…it was just a couple of words," and then Agent Triana, who is fluent in Spanish, took over the conversation. (Id. at 18-19.) Agent Triana identified himself as law enforcement and displayed his badge. (Id. at 19.) According to Agent Triana, Jaramillo acknowledged that he lived in Apartment 3N, and that the other man who had just entered the apartment was his guest. (Id.) Agent Triana said he would like to go into the apartment and speak to the other man. Jaramillo said okay, and started walking

---

[3] Agent Triana also has a law degree. (Hr'g. Tr. 72, Oct. 5, 2007.)
[4] As discussed below, Agent Shanahan had followed Defendant, observed him approach an apartment on the third floor, and observed Jaramillo opening the apartment door for Defendant. (Hr'g. Tr. 158-159, Oct. 5, 2007.)

4

toward his apartment (Id. at 19-20.)

At the door to the apartment, Jaramillo asked Agent Triana if he had "a paper" to enter the apartment. (Id. at 20.) In response, Agent Triana said that "I did not have a search warrant for the apartment, but that I could get one from a judge. I told him we could wait outside the door, if he would like and we would get a search warrant, but I would like your cooperation because I think the person inside has drugs." (Id.) Agent Triana testified that while speaking about the search warrant, he was slightly further than usual way from Jaramillo, because Jaramillo was an unknown male who, although apparently cooperative and calm, had not been searched or frisked. (Id. at 22-23.) He also testified that he spoke to Jaramillo in a normal speaking tone. (Id. at 26.) According to Agent Triana, Jaramillo then opened the door without further inquiry. (Id.) Agent Triana did not ask Jaramillo to sign a consent form, because he did not have one with him, and he never thought of it. (Id. at 30.)

On direct examination, Agent Triana denied that at any point in time had he threatened to ransack Jaramillo's apartment if Jaramillo refused entry. (Id. at 20.) Agent Triana stated that his translation of search warrant was "orden de registro," which, he said, implies that the apartment would be searched. (Id. at 21.) Agent Triana testified that he only searched Defendant's room.[5] (Id. at 29.) On cross examination, Agent Triana testified that he did not tell Jaramillo it would take hours, or any other period of time, to obtain a warrant. (Id. at 55.)

---

[5] On cross-examination, the defense brought out that, based on the telephone intercept on March 24, 2007, Agent Triana believed that a target of the investigation was going to meet with a courier at the pool hall near Roosevelt Avenue, and that heroin was going to be transferred. (Hr'g. Tr. 34-37, Oct. 5, 2007.)

*ii. Agent Shanahan's Testimony*[6]

At the October 5, 2007 hearing, Agent Shanahan testified that, on March 24, 2007, he was not wearing a badge and that he was in plainclothes. (Id. at 156.) He testified that he entered the apartment building following Defendant, and rode with Defendant and two other unknown passengers in the elevator. (Id. at 157.) The two unknown passengers were together and pressed the button to go to the 5th floor, Defendant did not push any button, and Agent Shanahan pressed "6" in order to ascertain to which floor Defendant was going. (Id. at 158.) Agent Shanahan then got out on the 6th floor leaving the Defendant in the elevator. (Id.) Agent Shanahan descended the stairway to try to figure out to which floor Defendant was going. (Id.) When Agent Shanahan reached the third floor landing, he observed Jaramillo open the door of Apartment 3N for the Defendant. (Id. at 158-159.) Agent Shanahan said he then went to the first floor where he met Agent Triana. (Id. at 159.)

Agent Shanahan testified that he did not speak to Jaramillo, but that Agent Triana spoke with Jaramillo in Spanish. (Id. at 160, 173.) Agent Shanahan stated that when the agents arrived at the apartment door with Jaramillo, Agent Shanahan took out his gun from his waist and held it pointing toward the ground. (Id. at 162.) Agent Shanahan said the conversation between Jaramillo and Agent Triana was not long, and that there was "never a pause" when Jaramillo opened the door. (Id. at 162.) Agent Shanahan testified that Jaramillo was calm, cooperative, and did not appear nervous; and that Jaramillo was never frisked. (Id. at 165, 168.)

*iii. Jaramillo's Testimony*

---

[6] For logistical reasons and with the consent of counsel, Agent Shanahan's testimony was taken after Jaramillo's.

6

Jaramillo testified through a Spanish interpreter that he has lived in this country for fifteen years and that he is married to, but separated from, a U.S. citizen. (Id. at 79.) Jaramillo lives in an apartment leased by his father-in-law, and Jaramillo pays the rent for the apartment. (Id. at 81.)

Jaramillo testified that the agents, who were wearing badges, frisked him in the lobby of his building, and followed him back upstairs to his apartment. (Id. at 87-88.) Jaramillo stated that when he got to the apartment door, he asked "the Spanish-speaking agent" (Agent Triana) if he had a warrant to enter, and that Agent Triana replied that it would "take two or three hours in order to get the warrant and that he was going to go in and possibly destroy [Jaramillo's] apartment in his search and possibly could detain [Jaramillo] as well." (Id. at 92.) He testified that he then opened the door and said to the agents that he "had no problem." (Id. at 93.) When asked why he had agreed to open the door, he said, "First because I thought at my house there is nothing, and secondly, because I did not want them to get a warrant and destroy the apartment."[7] (Id.)

Jaramillo also testified that the white agent (Agent Shanahan) had a gun pointed towards the floor before entering the apartment, but he did not testify that he was frightened by the gun. (Id. at 93.) Jaramillo stated that he was frightened because he did not want the agents to damage his apartment and he "did not want any problems," so he opened the door for them. (Id. at 92-93.) On cross-examination, Jaramillo acknowledged

---

[7] Jaramillo said that the Spanish word the agent used to describe what he could do to the apartment was "desbaratar." (Hr'g. Tr. 93, Oct. 5, 2007.) The Spanish interpreter said the word "desbaratar" can mean "dismantle or take apart." (Id. at 135.) When asked to clarify, Jaramillo stated that the agent said the apartment could be dismantled, not that it would be dismantled if they were not permitted entry. (Id. at 135.) Jaramillo also stated that he understood the word "ransack," which was used in his affidavit, to mean "to check the apartment." (Id. at 138.) The dictionary states that "ransack" means "to look very thoroughly and zealously through." WEBSTER'S NEW INTERNATIONAL DICTIONARY 1881 (Merriam-Webster Inc. 3d ed. 1986). A Spanish-English dictionary also states that "ransack" means "to search." COLLINS SPANISH DICTIONARY 387 (Harper Collins 2d ed. 1993).

7

that Agent Triana told him that if he cooperated, they were only going to look through Defendant's belongings, and that the officers did not yell at him, and were polite. (Id. at 126-27, 136.)

*B. The Consent to Search the Suitcase*

*i. Agent Triana's Testimony*

Agent Triana testified that, upon entering the apartment, he saw Defendant and asked him to sit on the couch (Id. at 28-29.) Agent Triana asked Jaramillo if he could look around, and when Jaramillo answered yes, he asked Jaramillo to accompany him. (Id. at 29, 64.) Jaramillo and Agent Triana walked through the rooms in the apartment, and Jaramillo identified the different rooms, including the room the Defendant was using. (Id. at 64-68.)

Agent Triana then asked Jaramillo to sit on the couch and asked Defendant to come into the bedroom with him. (Id. at 193-94.) He told Defendant that he had followed him from the airport and that he believed there was something illegal inside the suitcase, and that with Defendant's permission he would like to look inside the suitcase.[8] (Id. at 194.) According to Agent Triana, the Defendant replied "okay, no problem." (Id. at 195.) Agent Triana testified that after Defendant returned to the couch, Agent Triana approached the suitcase and realized it was locked. He went back to the couch and asked Defendant for a key, and Defendant reached into his pocket and gave him the key to the suitcase. (Id. at 196.)

Agent Triana next asked Defendant to come back into the bedroom and asked

---

[8] He also testified that he did not ask Defendant for permission to search his room because there was only a mattress on the floor and a suitcase on the floor, so there was nothing to search except a suitcase. (Hr'g. Tr. 69-70, Oct. 5, 2007.) He also stated that he did not observe Agent Shanahan with his gun drawn at any time, but he did not have his eyes fixated on Agent Shanahan (Id. at 65-66), and that Jaramillo stated the Defendant did not have a key to the apartment. (Id. at 64.)

8

Defendant to unlock the suitcase. (Id. at 196-97.) However, when Defendant unlocked the suitcase, Agent Triana realized there was danger in that situation, and had Defendant return to the couch, at which time Agent Triana searched the suitcase and found nothing. (Id. at 198.) He then came out the bedroom and did suggest to Agent Shanahan that he try searching, but as Agent Triana was putting clothing back in the suitcase, he found a small quantity of heroin wrapped in a piece of clothing in the suitcase. (Id. at 199.) Agent Triana testified that he "couldn't believe that it was so little, because couriers don't—and I didn't think he had dropped off a smaller shipment based on the intercept. So it was a plastic bag with pellets, and it was like approximately 140 grams gross weight." (Id.) He stated, "I think after discovering the heroin, I told [Agent Shanahan] maybe it's inside the lining of the suitcase. Maybe the clothes—it's something in the clothes maybe dropped off. Maybe we should try to open the lining, but I don't recall saying—getting a knife or scissors." (Id.) Agent Triana also testified that he did not use any knives or scissors to tear the suitcase. (Id. at 200.)

On cross-examination, Agent Triana basically repeated the testimony that he had given on direct examination. He admitted, as he had admitted on his direct testimony, that he lied to Defendant when he told Defendant that he followed Defendant from the airport. (Id. at 194-95, 207.) He testified that he did so for the purpose of not revealing that the source of the information was the wiretap intercepts. (Id. at 207.) He repeated his testimony that he observed the suitcase was locked only after Defendant consented to its search. (Id. at 208-09.) He also admitted that in a written report he prepared four days after the arrest, he had described the suitcase as locked before he had described asking Jaramillo whether the suitcase belonged to him. (Id. at 209-210.) Agent Triana said the

written report was in error in stating that he observed the suitcase was locked before he asked Jaramillo about it, and that his memory was better at the hearing than it was four days after discovering the heroin, when he prepared the report. (Id. at 211.) Agent Triana also testified on cross-examination that he did not "recall ever seeing Jaramillo in the bedroom" (Id. at 222.)

*ii. Agent Shanahan's Testimony*

After the door to the apartment was opened, Agent Shanahan said he did a quick check of the rooms in the apartment to be sure no one else was there. (Id. at 164.) Agent Shanahan testified that Agent Triana "relayed to me that Porras-Quintero was staying in one of the rooms of the apartment. I maintained an eye on Mr. Jaramillo and Mr. Porras-Quintero. They were sitting in the living room area of the apartment." (Id. at 165.) At that time, Agent Shanahan did not have his gun drawn, and Agent Triana was searching in the bedroom that was connected to the living room. (Id.) Agent Shanahan testified that Agent Triana searched the suitcase, initially did not find anything, and then asked Agent Shanahan if he wanted to give it a try; but then, as Agent Triana was going through the suitcase, he did find something. (Id. at 166.) Agent Shanahan never tried searching the suitcase. (Id.)

When asked if there was mention of a key to the suitcase, Agent Shanahan testified that after Agent Triana first went into the bedroom he then asked whose suitcase it was and Defendant identified that it was his suitcase. (Id. at 167.) After an exchange in Spanish, Defendant handed Special Agent Triana a key. (Id.) Agent Shanahan testified that Agent Triana did not search Defendant's pockets and pull out any keys. (Id. at 171.) He testified that "subsequently, Special Agent Triana had Mr. Porras-Quintero

open the suitcase with the key, and he searched it. But at that point Mr. Porras Quintero and Mr. Jaramillo are both in that bedroom just standing up against the wall—I'm standing at the doorway of that room." (Id. at 167.) Agent Shanahan testified that after Agent Triana found the drugs, he gave them to Agent Shanahan as they left the apartment. (Id. at 170-71.)

Agent Shanahan testified that he never saw anyone with a knife or scissors, nor did he see anyone cut the suitcase. (Id. at 169, 170.) On cross-examination, Agent Shanahan testified that nothing, other than the drugs found that evening, was vouchered; and that nothing was done to safeguard, preserve, or in any manner maintain the integrity of the suitcase. (Id. at 185.)

*iii. Jaramillo's Testimony*

According to Jaramillo, after entering the apartment, Agent Shanahan remained in the living room with Defendant and Jaramillo, with his gun drawn, but pointing toward the ground. (Id. at 96.) Agent Triana asked which room was Defendant's, Jaramillo pointed to the room, and Agent Triana went into it. (Id. at 98.) After 10 or 15 minutes, Agent Triana came out and said Jaramillo better get Defendant to cooperate because he knew Defendant "had something and they were looking for him." (Id. at 101.) Agent Triana asked where the keys were to the suitcase, but neither Jaramillo nor Defendant answered, and Jaramillo did not know what he was asking about. (Id. at 102.) According to Jaramillo, when Defendant said nothing in response to the agents asking for a key, Agent Triana approached Defendant and removed the key from his jacket or pants, but he did not recall whether Defendant was seated or standing at that time. (Id. at 102.) According to Jaramillo, Defendant remained in the living room when Agent Triana

11

returned to the bedroom (Id. at 103.)

Agent Triana later came out the bedroom and asked if Jaramillo had a pocket knife or a knife that he could use to cut. (Id.) According to Jaramillo, Agent Triana then went to the kitchen, brought out a knife, and went into Defendant's room with the knife. (Id. at 104.) Agent Triana came out the bedroom again and "told his partner to take a look, because he had not been able to find anything." (Id.) According to Jaramillo, after about five minutes, Agent Shanahan came out the bedroom and said, "'I got it.' He said he had found what he was looking for. He had a small black baggie with him, but I did not see what was inside of it." (Id.)

Jaramillo stated that the agents had not asked Defendant for permission to search his suitcase. (Id. at 106.) Finally, Jaramillo testified that after the agents left, Defendant's room "was a mess" and the suitcase was cut. (Id. at 107.) Jaramillo threw away the suitcase after about two weeks, since the agents had told him they did not need it. (Id.)

*C. The Stipulation*[9]

Defendant and the Government stipulated the following facts regarding the inconsistencies of Jaramillo's testimony during the hearing and in his statements to the defense investigator.

> 1. Jaramillo told the investigator that, in response to the Spanish-speaking DEA agent's questions whether anyone in the apartment had a key for the locked suitcase in the bedroom, Defendant handed the DEA agent a key to the suitcase;

---

[9] At the October 5, 2007 hearing, Jaramillo testified that an investigator for Defendant took copious notes during his interview with Jaramillo. (Hr'g. Tr. 111, Oct. 5, 2007.) By letter dated October 6, 2007, defense counsel confirmed that, after speaking with the defense investigator, no contemporaneous notes were taken during the interview with Jaramillo.

12

2. Jaramillo did not tell the investigator that the DEA agents threatened to arrest him at any point in their interaction with him.

3. Jaramillo did not tell the investigator that the DEA agents frisked him in the lobby of the building when he first encountered the agents.

(Stipulation, Oct. 24, 2007.)

**DISCUSSION**

The Government relies on the consent of Jaramillo to enter the apartment and the consent of Defendant to search the suitcase. When the Government relies upon consent to justify the lawfulness of a search, it "has the burden of proving that the consent was, in fact, freely and voluntarily given" by a preponderance of the evidence. Bumper v. North Carolina, 391 U.S. 543, 548 (1968); see also United States v. Mendenhall, 446 U.S. 544, 557 (1980). When reviewing the voluntariness of consent, the Court must consider the totality of the circumstances. Schneckloth v. Bustamonte, 412 U.S. 248 (1973). "Consent must be a product of that individual's free and unconstrained choice, rather than a mere acquiescence in a show of authority." United States v. Wilson, 11 F.3d 346, 351 (2d Cir. 1993); see also United States v. Garcia, 56 F.3d 418, 422 (2d Cir. 1995); United States v. Kon Yu-Leung, 910 F.2d 33, 41 (2d Cir. 1990). The standard for measuring consent is one of "objective" reasonableness -- what would the typical reasonable person have understood by the exchange between the officer and the suspect." Florida v. Jimeno, 500 U.S. 248, 251 (1991)

In determining whether consent was voluntarily given, courts consider several factors: 1) youth; 2) lack of education or low intelligence; 3) lack of any advice to as to constitutional rights; 4) length of detention; 5) the repeated and prolonged nature of the

questioning, 6) and the use of physical punishment such as the deprivation of food or sleep. Schneckloth at 226.

*A. Consent to Enter the Apartment*

It is well established that a third party can grant consent to enter and search a defendant's residence when that party has common authority over the premises. Ill. v. Rodriguez, 497 U.S. 177, 181 (1990); see also United States v. Matlock, 415 U.S. 164, 172 at n.7 (1974) ("it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched.").

Here, Jaramillo was the resident occupying the apartment, and he rented a room to Defendant for approximately two to three weeks. (Hr'g. Tr. 82, Oct. 5, 2007.) Only Jaramillo had the keys to the apartment. (Id. at 64.) Jaramillo is thirty four years old (Id. at 78), was spoken to in Spanish, a language in which he is fluent, and he was informed and intelligent enough to ask the agents if they had "a paper" to enter his apartment. (Id. at 20.) There were only two agents present, and conversation concerning the warrant requirement was short and not the result of detention. Jaramillo was never handcuffed, frisked, or otherwise threatened; and weapons were never pointed at him. (Id. at 31.) After Agent Triana told Jaramillo that they could wait outside the apartment to get a warrant, and that his sole interest was in the Defendant, Jaramillo opened the door with his keys without further inquiry. He told the agents that he "had no problem." (Id. at 93.)

Assuming that Jaramillo's testimony is accurate, his testimony reflects no outward manifestations by him of his fears, or of any visible reluctance when promptly opening the door for the agents. (Id.) Therefore, typical reasonable person would not

14

understand the exchange between Jaramillo and Agent Triana to involve coercion under these circumstances. See Florida v. Jimeno, supra.

In addition, the Court finds that testimony by Agent Triana that he did not threaten "to detain" Jaramillo, did not tell him that the agents would wait "several hours" for the warrant to arrive, and did not tell him that they would "destroy" his apartment if they had to get a search warrant, was more credible than Jaramillo's claims to the contrary. Those testimonial claims by Jaramillo were not included in his affidavit prepared by the defense investigator. Second, Agent Triana was a highly credible witness, while Jaramillo's credibility was impaired by a tendency to embellish his testimony as time went by. In any event, those claims by Jaramillo would not vitiate the voluntariness of consent. See United States v. Wilkinson, 926 F.2d 22, 24 (1st Cir. 1991) (upholding a finding of voluntary consent when four officers entered the house with guns drawn, handcuffed and frisked the defendant, and "threatened to tear the place apart," which could have been interpreted as a statement that the house would be searched thoroughly); United States v. Wilkerson, 76 Fed. Appx. 657 (6th Cir. 2003) (upholding a finding of voluntary consent when police stated they would "tear the car apart" meaning the car would be searched exhaustively); United States v. Ceballos, 812 F2d 42 (2nd Cir. 1987) (holding that "the totality of the circumstances" showed voluntary consent even though law enforcement persuaded consent by warning the defendant of "disruption to his household" and by promising the defendant low bail and retention of his job). Accordingly, the agents' entry to this apartment was lawful.

*B. Consent to Search the Suitcase*

On this issue, there has been contradictory evidence. At the hearing, Jaramillo,

who ostensibly had no interest in the outcome, testified that in response to Agent Triana asking where the keys to the suitcase were, the Defendant remained silent (Id. at 102), and that Agent Triana then removed the keys from the Defendant's jacket or pants. (Id.) Jaramillo did not remember if the Defendant was seated or standing at the time. (Id.) Afterwards, he testified that the Defendant did not accompany Agent Triana into the bedroom (Id. at 101-103.) He also testified that the agents never asked the Defendant for permission to search the suitcase (Id. at 106), and that the Defendant never said anything or left the living room at any time. (Id. at 105, 139-40.) Jaramillo also testified that he did not show Agent Triana the various rooms of the apartment at the outset, but did so later. (Id. at 106.) Finally, Jaramillo's testimony that Agent Shanahan found the drugs is contrary to the testimony of both agents, who both testified that it was Agent Triana who found the drugs. (Id. at 199, 166.)

Jaramillo's testimony is subject to considerable question. On cross-examination, Jaramillo testified that he had met with the defense investigator twice and had told him everything he knew about the night Defendant was arrested, and about everything he had testified to on direct examination. (Id. at 110-11.) Yet, his testimony departed significantly from the facts indicated in his affidavit or in the defense investigator's report. First, he told the investigator and stated in his affidavit that the Defendant "gave the officer the key" (Jaramillo Aff. ¶ 6), whereas he testified that the officer searched Defendant's pocket and took the key. (Hr'g. Tr. 102, Oct. 5, 2007.) Second, in his testimony, he stated that he understood the word "ransack," which was used in his affidavit, meant that the agents would "check the apartment." (Id. at 134-35, 138.) At the hearing, he testified that Agent Triana told him that the agents "could" dismantle the

16

apartment. (Id. at 135-138.) Third, he testified that Agent Triana told him that the search could result in his detention. (Id. at 92.) It is unlikely that an investigator looking into the lawfulness of the search of an apartment would overlook a threat of arrest, the threat of dismantling the apartment, or the significance of an agent reaching into the Defendant's pocket and taking the key. Fourth, Jaramillo also testified that when he was interviewed, the defense investigator took copious notes, but the Defendant has conceded that the investigator did not take contemporaneous notes. (Tr., supra note 9.)

In contrast, Agent Triana appeared to have a clear and detailed recollection of the events in question. He is an experienced agent and gave credible testimony that the Defendant consented to the search of the suitcase out of the presence of Jaramillo (Id. at 194-95), that the Defendant gave him the key to the suitcase in Jaramillo's presence, and unlocked the suitcase in the bedroom outside of Jaramillo's presence. (Id. at 195-97.)

Agent Shanahan was not asked to testify step by step as to what transpired after the agents entered the apartment, but he corroborated that the Defendant identified the suitcases as his (Id. at 167), and after an exchange in Spanish handed Agent Triana the key (Id.), that Triana did not search Defendant's pockets or pull out any keys (Id. at 171.) and that Agent Triana had the Defendant open the suitcase with the key. (Id. at 167.) Agent Shanahan testified that at some point during Agent Triana's search of the suitcase, both Jaramillo and Defendant were in the bedroom (Id. at 167, 169), which contradicts Agent Triana's recollection that Jaramillo was not in the bedroom at that point, but this is not a material contradiction considering that Agent Triana testified that he was "totally fixated" on searching the suitcase. (Id. at 222.)

At oral argument on October 24, 2007, Defense counsel urged this court that if

17

"the consent to enter was in fact voluntary, that the government has failed to demonstrate by the appropriate standard of proof that the defendant Quintero consented to the search of his suitcase or the scope of that search." (Hr'g Tr. 8, Oct. 24, 2007.) However, the Government has also met its burden of proving that the consent to search the suitcase was, in fact, freely and voluntarily given. See Bumper supra. Here, there is no evidence that the Defendant was handcuffed, threatened, or forced to give his consent to search the suitcase or to open it. Defendant speaks Spanish fluently, and Agent Triana, who is also fluent in Spanish, spoke to him in Spanish. In his affidavit attached to his motion to suppress evidence and statements, Defendant does not state that he did not give consent to search the suitcase. (Porras-Quintero Aff.) Based on the testimony of Agents Triana and Shanahan, a reasonable person would not find the exchange between Defendant and the agents to be coercive.

After weighing all the evidence, it is this Court's conclusion that the Government has sustained its burden of proving, by a preponderance of the evidence, that the Defendant's consent to search the suitcase was in fact freely and voluntarily given Bumper, supra; Mendenhall, supra; and that Jaramillo's testimony on these points is not credible. Accordingly, despite what Defendant argues, the fruits of the search were not seized in violation of the Fourth and Fourteenth Amendments to the United States Constitution.

### III. CONCLUSION

For the aforementioned reasons, Defendant's motion to suppress is denied. A conference will be held on January 4, 2008 at 4 p.m. to set a trial date.

IT IS SO ORDERED.

Dated: New York, New York
December **21**, 2007

_____
Robert P. Patterson, Jr.
U.S.D.J.

*Copy of This Opinion and Order Sent to:*

Defense Counsel

Alan M. Nelson, Esq
3000 Marcus Ave, Suite 15
Lake Success, NY 11042
(516)-328-6200
Fax: (516)-328-6354


Assistant United States Attorney

Avi Weitzman
United States Attorney, Southern District New York
One Saint Andrew's Plaza
New York, NY 10007
(212)-637-1205
Fax: (212)-637-2527